# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| **In re** <br><br> **RICHARD D. CRAWFORD,** <br><br>         **Debtor** <br> ——————————— <br> **PREMIER CAPITAL, LLC,** <br><br>         **Plaintiff** <br><br> **v.** <br><br> **RICHARD D. CRAWFORD,** <br><br>         **Defendant** | **Chapter 7** <br> **Case No. 09-17651-FJB** <br><br><br><br><br><br> **Adversary Proceeding** <br> **No. 09-1366** |

## MEMORANDUM OF DECISION

By its complaint in this adversary proceeding, plaintiff and creditor Premier Capital, LLC ("Premier") objects to the discharge of the defendant and chapter 7 debtor, Richard D. Crawford ("Crawford"), under 11 U.S.C. § 727(a)(2)(A), (a)(3), (a)(4)(A), and (a)(5).  After a three-day trial, the Court now makes the following findings and rulings and, on the basis thereof, concludes that Premier has established cause for denial of discharge.

I.      **Procedural History**

On August 11, 2009, Crawford filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code.  In the case thereby commenced, Premier timely filed the instant adversary proceeding.  By its complaint in this proceeding, Premier objects to Crawford's discharge under 11 U.S.C. § 727(a)(2)(A), (a)(3), (a)(4)(A), and (a)(5).

The complaint recites certain facts and then sets forth four counts, one for each subsection of §

727(a) on which Premier is relying.  Each count merely recites the language of the relevant statutory

subsection without specifying which (if any) of the earlier-recited facts constitute the basis or bases for

relief under that subsection.  Premier did not correct this shortcoming in the Joint Pretrial Memorandum

that it joined in filing in this matter.

Nonetheless, in a pretrial brief that Premier filed six days before the start of the trial (the

"Pretrial Brief"), Premier indicated what it intended to show at trial.  Regarding its count under §

727(a)(2)(A), Premier indicated that its specific allegation is that Crawford, with intent to hinder, delay,

or defraud a creditor, Premier, concealed certain property of the debtor within one year before the date

of the filing of the petition, property that in each instance was held in the name of his wife or his son.

The assets in question are (i) salary that Crawford received and transferred to an account in his wife's

name, (ii) his interests in two North Carolina properties the Crawfords purchased for retirement, (iii) the

proceeds of an investment property on Cape Cod, and (iv) three antique automobiles titled in Mrs.

Crawford's name.  Regarding its count under § 727(a)(3), Premier alleged that Crawford failed to keep or

preserve recorded information—specifically concerning the deposits into and disbursements from

certain savings bank accounts of Mrs. Crawford into which Crawford's earnings were deposited—from

which his financial condition or business transactions might be ascertained.  Regarding his count under §

727(a)(4)(A), Premier alleged that, by omissions from the schedules and statement of financial affairs he

filed in his bankruptcy case, Crawford knowingly and fraudulently made various false oaths in his case:

- He failed to disclose the existence of his deferred compensation plan.
- He failed to disclose on Schedule A his equitable interests in the North Carolina properties.
- He failed to disclose or list "property such as the real properties, automobiles and bank accounts nominally held by his wife."[1]
- He stated that he had not made any transfers of property within two years of the petition date.[2]

---

[1]  Premier's pretrial brief did not specify the "real properties, automobiles and bank accounts" at issue.

2

- He failed to disclose the existence of a 2009 tax refund.
- He failed to disclose the existence of a safe deposit box.
- He failed to disclose the existence of a pending lawsuit against him, his wife, and his son relating to his fraudulent transfer of assets to them.

And regarding his count under § 727(a)(5), Premier alleged without elaboration that Crawford has failed to explain satisfactorily the deficiency of his assets to meet his liabilities. Premier has not moved under Fed. R. Civ. P. 15(b) to amend the complaint to conform to the evidence or to raise an unpled issue.

The adversary complaint was tried over three days, during which Crawford, Mrs. Crawford, and Michael Crawford testified and numerous exhibits were introduced into evidence.  Premier submitted a post-trial brief, and Crawford submitted proposed findings and conclusions.  The Court then heard closing arguments and took the matter under advisement.

## II.  Findings of Facts

The following constitute the Court's findings of fact.  As a preliminary matter, I note that I found Crawford, in his testimony upon examination by Premier's counsel, to be consistently evasive and non-cooperative.  By virtue of that demeanor, of many of his answers, of numerous misrepresentations he made in financial statements over decades, I find him less than credible.

At one point, he testified that he had a bad habit of signing documents without first reading them.  In a proceeding in which his opponent may satisfy its burden by proving that he acted with reckless disregard for the truth of certain averments, this testimony amounts to an admission against interest, but I doubt that Crawford appreciated this when he gave this testimony.  Rather, I believe that in so testifying, he believed he was *enhancing* his credibility:  in effect, "I'm just careless, not a liar." Accordingly, I hesitate to give it the weight one would normally give an admission against interest.

---

[2]  Premier's pretrial brief did not specify the transfers that Crawford allegedly omitted.

a.      **Events Through 2002**

1.      Crawford has worked in the banking industry in various positions since 1968, and he has worked in his current position as a residential mortgage originator with Wells Fargo since approximately 1997.  He married Cynthia Crawford ("Mrs. Crawford") in 1976.  Each has two children by a previous marriage, and together they have one son, Michael, born in 1980.   Also in 1980, the Crawfords purchased as tenants by the entirety certain real property in Ashland, Massachusetts (the "Ashland Property"), which has been the family's principal residence since its acquisition.

2.      In addition to working as a banker and mortgage originator, Crawford has over the years been involved in other business ventures.  In 1986 he became the president and 80 percent owner of a landscaping business known as Centre Landscape Corporation ("Centre Landscape").  Also in 1986, he became the Trustee and an 80 percent beneficiary of the Oak Street Realty Trust ("the Realty Trust"), a Massachusetts nominee trust that owned property on Oak Street in Ashland that Crawford intended to subdivide and develop.  In September 1987, Amoskeag Bank ("Amoskeag") loaned the Realty Trust $250,000 (the "Amoskeag Loan"); the loan was secured by a mortgage on the Oak Street property.

3.      On or about February 22, 1989, the Crawfords transferred title to the Ashland Property from Richard and Cynthia Crawford, as tenants-by-the-entirety, to Cynthia Crawford individually.  This transfer was made for no consideration.  As the Superior Court later found, in a finding that has preclusive effect here, this transfer was not made to hinder, delay, or defraud creditors, and Crawford was not insolvent when the transfer was made.

4.      On or about September 1, 1990, Amoskeag and Crawford, as trustee of the Realty Trust, entered into a Change in Terms Agreement with Amoskeag as to the Amoskeag Loan that, among other things, extended the maturity date of the loan.  In connection with the Change in Terms Agreement, Crawford in his individual capacity guaranteed repayment of the Amoskeag Loan (the "Guaranty").

5.       Also in connection with the Change in Terms Agreement, on August 8, 1990, Crawford

provided a financial statement to Amoskeag (the "1990 Financial Statement").  In it, he identified his

wife as the owner of the Ashland Property and stated that he had no interest in the property.

6.       On September 1, 1991, the Amoskeag Loan matured, and Crawford and the Realty Trust

failed to pay it.  On October 3, 1991, attorneys for Amoskeag sent Crawford a letter that notified him of

his default and demanded payment of principal, interest, and late fees totaling approximately $280,000.

7.       On October 10, 1991, the Federal Deposit Insurance Corporation ("FDIC") was appointed

receiver and liquidating agent for Amoskeag.  In 1993, the FDIC as receiver for Amoskeag foreclosed on

the Oak Street property.  On or about June 22, 1994, the FDIC, as liquidating agent for Amoskeag,

assigned Amoskeag's interest in Crawford's Guaranty of the Amoskeag Loan to Tenth RMA Partners, L.P.

("RMA").

8.       In April 1999, RMA filed suit in the Middlesex Division of the Superior Court Department

of the Trial Court of the Commonwealth of Massachusetts ("Middlesex Superior Court") against

Crawford on the Guaranty.  Crawford elected not to defend and, on October 20, 2000, suffered

judgment to enter against him in the amount of $388,753.01.

9.       In the latter half of 1999, while the RMA suit was pending, the Crawfords decided to

purchase land in Ocean Isle Beach, North Carolina on which they hoped to build a retirement home for

themselves.  They purchased two lots:  Lot 147 for $67,900 in August 1999 and Lot 54 for $92,900 in

February 2000.  They took title to both lots in the name of Mrs. Crawford alone.  In each instance, they

made a down payment of ten percent of the purchase price and financed the balance with a mortgage

loan on which both Crawford and Mrs. Crawford were obligated.  Each loan was secured by a mortgage

on the lot the loan was incurred to purchase, and both Crawfords joined in granting each mortgage.

10.       For each property, as part of the mortgage application process, the Crawfords

completed a Uniform Residential Loan Application ("URLA"), Crawford as the borrower and Mrs.

Crawford as the co-borrower.  Both Crawfords signed each URLA and thereby expressly certified that "the information provided in this application is true and correct."  In relevant part, the URLAs for the two lots contained the same representations.

a.  Each form asked "Are you a party to a lawsuit?"  On each Crawford answered "no."  This answer was false:  Crawford was a defendant in the RMA suit at the time.

b.  Each form asked "Have you directly or indirectly been obligated on any loan which resulted in foreclosure . . . ? (This would include . . . loan guarantees.)"  On each Crawford answered "no."  This was false:  Crawford was obligated on a guarantee of the Amoskeag Loan, which had resulted in foreclosure.

c.  Each form asked "Are you presently delinquent or in default on any . . . loan guarantee?"  On each Crawford answered "no."  This was false:  Crawford was then in default on his guarantee of the Amoskeag Loan.

d.  Each form asked "Have you had an ownership interest in a property in the last three years?"  And if so, "what type of property did you own, principal residence, second home, or investment property?" And "how did you hold title to the home—solely by yourself, jointly with your spouse, or jointly with another person?"  Crawford and Mrs. Crawford each answered that he or she had had an ownership interest in the last three years, that the property in question was a principal residence, and that each had held title jointly with the other.  The last of these answers, made by both Crawford and Mrs. Crawford on both URLAs, was false:  during the entire three-year period, title had been held in Mrs. Crawford's name alone.

11.  In both URLAs, each of the foregoing false answers was made by Crawford and Mrs. Crawford, as applicable, with knowledge of its falsity.  When asked at trial about his ownership assertions regarding the Ashland Property, Crawford testified that the lender had filled out the URLAs

and that he had signed them without reading them.  I credit Crawford's testimony that he signed the

application without reading it, but Crawford himself is not generally credible, and his testimony is not

credible where he blames the loan originator for the false answers.  The false answers are consistent

with false representations he has made in several other loan applications, to other loan originators.  The

common element is the applicant, not the loan originator.

12.      The first of the two URLA's indicated that the value of the Ashland Property was

$350,000 and that mortgages and liens against it totaled $190,000.  The later of the two URLA's, dated

February 3, 2000, indicated that the value of the Ashland Property was $370,000, that it was

encumbered by mortgages and liens totaling $189,000.

13.      On May 22, 2000, also while the RMA suit was pending, Crawford submitted a personal

financial statement to Norwood Cooperative Bank in connection with a personal line of credit he had

with the bank.  This statement pertained to him alone and was not a joint statement with Mrs. Crawford.

Crawford completed the statement by hand.  In the statement, Crawford asserted that he owned one

hundred percent of the Ashland Property and of both North Carolina Properties.  These assertions were

inconsistent with record legal title, which as to each property was wholly in Mrs. Crawford alone.

Crawford also indicated that his assets included antique autos with a value of $100,000.  Above the

signature line, the statement included the following language:   "The undersigned acknowledge and

understand you are relying on the information provided herein in deciding to grant or continue credit or

to accept a guarantee thereof.  Each of the undersigned represents, warrants, and certifies that the

information provided herein is true."  Crawford signed the statement.  When asked at trial about his

ownership assertions as to the three properties, Crawford stated that "it appears that it [the statement]

was inaccurate."

14.      On or about January 21, 2001, RMA assigned its rights to collect and execute upon the

judgment to Premier.  Premier then became, and now remains, the owner and holder of the judgment.

15.      On March 15, 2002, the Middlesex Superior Court issued an execution to Premier in the amount of $456,774.04.  The execution remains in full force and effect and, except for $7,030.68 that Premier recovered by wage garnishment in 2009, remains unsatisfied.  Crawford has made no voluntary payment on the judgment.

16.      On September 18, 2002, Premier, as successor-in-interest to Tenth RMA, filed suit in Middlesex Superior Court against Crawford and Mrs. Crawford, seeking to avoid and recover as a fraudulent conveyance Crawford's 1989 transfer of his interest the Ashland Property to Mrs. Crawford (the "2002 Action").   The 2002 Action was tried in April 2007 and decided in February 2009.

**b.      Crawford's Income and its Disposition, 2000-2009**

17.      From 1997 through the date of his bankruptcy filing in 2009, and with the exception of one year during which he was employed at another bank, Crawford was employed as a residential mortgage originator at Wells Fargo.  His income from that employment fluctuated with the strength of the housing market.  From 2002 thought 2004, when the market was strongest, his income was highest: he had gross income of $316,937 in 2002, $453,336 in 2003, and $255,061 in 2004.  In 2007 and 2008, when the market weakened, his income was weakest:  he had gross income of $88,169 in 2007 and $59,351 in 2008.  Crawford's gross income for each year from 2000 through 2009 is set forth in the table below.

18.      Mrs. Crawford has primarily been a homemaker but, at least from 2000 through 2009, has also been employed outside the home.  Her income from employment in this period never exceeded $22,436.50 and has always been much less than Crawford's.  Mrs. Crawford's gross income for each year from 2000 through 2009 is set forth in the table below.

19.      From the beginning of their marriage and at all times between 2000 and 2009, the Crawfords have maintained separate bank accounts.  Nonetheless, they would pool their earnings to pay household expenses.  As the primary wage earner of the household, Crawford supplied most of the

funds used to pay the household expenses.  While Mrs. Crawford would contribute her income to the monthly household expenses during periods in which she was working, her contribution has on the whole been much smaller than his.

20.    In the division of labor between the two spouses, Mrs. Crawford has borne the primary responsibility of paying the monthly household expenses.  Crawford paid business-related expenses directly from his account.  Every month, Mrs. Crawford would determine the amount needed to pay the household expenses and give Crawford a note with the amount she would need for him to transfer to her to pay the expenses.  Crawford, who received his employment income by direct deposit into his bank account, would then write her a check in that amount, and he or she would deposit it into her checking account.  The household expenses were typically between $7,000 and $10,000 each month— $84,000 to $120,000 per year.   Among other things, these included monthly payments of the mortgage on their residence (which varied from $1,800/mo. to $1,400/mo.), the combined mortgages on their North Carolina Properties ($1,125/mo.), and debt service on their home equity loan at Norwood Cooperative Bank (varied from $1,250/mo. to $1,774/mo.).

21.    The Crawfords kept their respective bank statements and the canceled checks drawn on Mrs. Crawford's account but did not otherwise keep itemized records of their household expenses. Every month, Mrs. Crawford would review her bank statement, balance her checking account against it, and file the statement.  She kept her bank statements for ten years.  Crawford did not keep receipts for the purchases he made, and at the end of each month, he would destroy all credit card and mortgage statements.  He kept his bank statements for ten years.

22.    The following table sets forth, for each year from 2000 through 2009, Crawford's and Mrs. Crawford's gross income from employment and their combined gross income from employment.  It also sets forth for 2001 through 2009 the portion of Crawford's gross income that he deposited into a

checking or savings account belonging to Mrs. Crawford (including a savings account belonging to Mrs.

Crawford and Michael Crawford jointly).

| Year | Crawford's Gross Income | Mrs. Crawford's Gross Income | Combined Gross Income | Crawford's Deposits into Mrs. Crawford's Accounts |
|------|------|------|------|------|
| 2000 | $168,067.12 | $22,436.50 | $192,503.62 | Not in evidence |
| 2001 | 217,973.00 | 18,277.52 | 238,251.52 | $105,340.65 |
| 2002 | 316,937.22 | 18,672.00 | 337,611.22 | 182,983.43 |
| 2003 | 453,336.94 | 18,946.32 | 474,286.26 | 255,524.13 |
| 2004 | 221,623.25 | 19,608.45 | 243,235.70 | 111,292.71 |
| 2005 | 190,232.67 | 10,670.22 | 202,907.89 | 98,752.58 |
| 2006 | 151,439.72 | 2,940.00 | 156,385.72 | 131,613.77 |
| 2007 | 88,169.73 | 12,844.89 | 103,021.62 | 124,653.25 |
| 2008 | 59,351.00 | 20,651.00 | 82,010.00 | 99,699.41 |
| 2009 | 121,285.00 | 20,748.00 | 144,042.00 | 78,362.85 |
| Totals | $1,988,415.65 | $165,794.90 | $2,174,255.55 | |

23.     The amounts that Crawford transferred to Mrs. Crawford's checking and savings

accounts from 2000 through 2009 constituted the vast majority of his after-tax income.  At trial,

Crawford testified that "99 percent of the time," he transferred to Mrs. Crawford only as much of his

own income as she needed to pay the monthly household bills.  This testimony is plausible as to most of

the years from 2000 through 2009, but it is not credible as to 2002 and 2003, in which he transferred to

Mrs. Crawford $182,983.43 and $255,524.13, amounts considerably in excess of their normal household

expenses.

24.     A forty-three page summary of the Crawfords' bank records admitted into evidence at

trial showed that from 2002 to 2004, Crawford made multiple deposits into Mrs. Crawford's account

each month.  On several occasions, he also made much larger deposits almost immediately after the

funds were made available to him.   The summaries also showed that from 2001 to 2003, some of the

funds were deposited into a savings account in Mrs. Crawford and Michael Crawford's names.   At times,

Crawford deposited funds into the savings account; other times, Mrs. Crawford deposited money into

the savings account from money Crawford had transferred to her for the monthly household expenses.

When asked at trial about the discrepancy between the amount of money transferred and the average

monthly expenses, Crawford explained that during these "good years," the money was used not only to

pay household expenses but also to take vacations and to retire debt that they had,  including a line of

credit, credit card debt, and car loans.

   25.  The evidence corroborates that some of the money was used for debt repayment.   In

January 2002, Crawford borrowed $50,000 on his line of credit at Norwood Cooperative Bank and,

within a month, used the proceeds to retire credit card debt of roughly that amount.   (It is not possible

from the evidentiary record to determine what expenditures gave rise to this credit card debt and when

they were made.)  Then, in July 2003, the Crawfords used $45,000 that had been deposited into the

savings account in Mrs. Crawford's and Michael Crawford's names to pay down the resulting obligation

on the line of credit.

   26.  Premier's summary of Crawford's American Express card accounts for 2003 through

2009 shows considerable expenditure from 2003 through 2007 on vacations:  at least two Caribbean

cruises and related air fare; a great deal of golf, mostly in Massachusetts but also in South Carolina,

Georgia, and Florida; air fare on multiple occasions to Myrtle Beach; a vacation to Las Vegas; several

purchases of air fare for large groups; fine jewelry purchased in St. Maarten.  These and other luxury

expenses that Crawford charged to his American Express Card totaled approximately $40,000 in 2004,

$30,000 in 2005, $14,000 in 2006, $8,000 in 2007.  Though there is evidence that Mrs. Crawford paid

some of her husband's American Express bills during this period, her payments were relatively small and

cannot have constituted the funding for these $92,000 in vacation expenditures.  Accordingly, I do not

credit Crawford's testimony that money he transferred to Mrs. Crawford was used to fund their vacations.

27.     Crawford has not accounted for the disposition of a significant portion of the excess cash he transferred to Mrs. Crawford in 2002 and 2003.  In those years, he transferred to her $182,983.43 and $255,524.13.  Assuming that monthly household expenses were at the high end of their range for those years, or $10,000 per month, these transfers should have left Mrs. Crawford with almost $200,000 in excess funds.  Crawford has accounted for expenditure of only $45,000 of this sum— on debt abatement in 2003.  The evidence also shows transfers by Mrs. Crawford for attorney's fees totaling $18,000.  This leaves $137,000 unaccounted for.  Still, it is clear that the Crawfords were spending at very high levels in from 2002 through 2005.  The evidence tends to support the conclusion that any monies over and above household expenses that Crawford transferred to Mrs. Crawford were long ago expended.  I have no evidence that at the time of the bankruptcy filing or in the year before the filing, Mrs. Crawford continued to hold any such fund, in accounts in her name or otherwise.

28.     Most of the deposits that Crawford made into Mrs. Crawford's accounts from 2001 through 2009 came from his earnings in those years.  In the years leading up to the filing of his Chapter 7 petition, however, Crawford's income declined, as did the frequency and amounts of his deposits into Mrs. Crawford's account.  Mrs. Crawford's account showed deposits of only $99,699.41 in 2008 and $78,362.85 in 2009.  To supplement his income and make ends meet, Crawford began drawing down on his 401(k) rollover IRA; he withdrew $28,000 in 2008 and $32,751 in 2009.  He also borrowed against the home equity line of credit and against a personal line of credit at Norwood Cooperative Bank.  He also took cash advances on his credit cards.  He transferred these funds in addition to his earnings to Mrs. Crawford to cover the household expenses.

c.      **Events from 2003 to Bankruptcy Filing in 2009**

(i)      **Transactions Involving Michael**

29.      In September 2003, Michael Crawford considered purchasing a rare antique automobile, an MG, from a seller in California.  His savings at the time, approximately $12,000 to $15,000, were insufficient to purchase the vehicle and have it shipped to Massachusetts.  Crawford, who liked antique cars as much as his son and supported this purchase, therefore gave Michael $30,000 to enable him to purchase the MG.  On September 15, 2003, Michael deposited the $30,000 into a Sovereign Premier Money Market Savings account (the "Sovereign Premier Account") in his own name.  In the end, Michael decided not to purchase the car.  Nonetheless, he did not return the $30,000 to Crawford, and Crawford did not ask Michael to return the money.  He testified that he considered it Michael's money, a gift, and I find that that was in fact their mutual understanding.

30.      In early 2004, while working at Wells Fargo, Michael was approached by a colleague, Eli Dummett ("Dummett"), about purchasing certain real property in Hyannis, Massachusetts (the "Cape Property").  Dummett and Michael planned to "flip" the Cape Property, renovate and sell the property in a short time for an expected profit.  At trial, Michael testified that Dummett approached him about the deal because Dummett had heard that Michael was generally handy.

31.      While Michael and Dummett planned to undertake the project together, Michael alone signed the purchase and sale agreement.  Though Crawford was not identified in the purchase and sale agreement as a purchaser of the property, he, not Michael, made the $1,000 payment that bound the agreement.

32.      To finance $191,900 of the $202,000 purchase price, Michael applied for a mortgage with Wells Fargo.  Crawford agreed to co-sign the mortgage loan.  Michael and Crawford each completed a separate URLA for the loan.

13

33.     On Crawford's URLA, he was listed as the borrower; Mrs. Crawford was not listed as a co-borrower.  In his URLA, Crawford made the following averments:

- that title to the Cape Property was to be held in the names of Michael P. Crawford and Richard D. Crawford;

- that he owned the Ashland Property jointly with Mrs. Crawford;

- that he had ownership interests in the Ashland Property and the North Carolina Properties;

- that there were no outstanding judgments against him;

- that he was not then a party to a lawsuit;

- that he was not then delinquent or in default on any loan guarantee;

- that he was not a co-maker or endorser of a note; and

- that he had not directly or indirectly been obligated on, by guarantee, any loan that resulted in foreclosure.

34.     Above the signature line, the URLA included the following language: "Each of the undersigned specifically represents to the Lender . . . that (1) the information provided in this application is true and correct as of the date opposite my signature."  Crawford initialed each page and signed his URLA.  The foregoing representations in the URLA were false and known by Crawford to be false when he made them.

35.     They were subsequently approved for the mortgage.  At a closing held on March 30, 2004, Michael acquired title to the Cape Property in his name alone.  Michael forgot to bring his checkbook to the closing, so, at the closing, Crawford paid the $9,200 necessary to fund the unfinanced part of the purchase price.  Michael paid Crawford back the next day, writing him a check from the Sovereign Premier Account, out of the $30,000 that Crawford had given Michael to purchase the MG.

14

36.     Renovations on the Cape Property began in the summer of 2004.  Shortly after the renovations started, Dummett and Michael had a falling out, and Dummett left the project.   Michael and Crawford continued the work on the Cape Property.  Michael did much of the labor and met with contractors.  Crawford also met with contractors, did some of the labor, and purchased goods and supplies for the Cape Property on his American Express charge card.  When Crawford received his monthly American Express statements, he identified the charges that had been incurred for the Cape Property, and Michael reimbursed him for them.

37.     In January 2005, Michael sold the Cape Property for $305,000.  After paying off the mortgage, the sale left him with net cash proceeds of approximately $100,000.

38.     In March 2005, Michael made a $4,500 payment on Crawford's American Express account to reimburse him for supplies Crawford had purchased for the Cape Property.

39.     Thereafter, Michael made additional payments on Crawford's American Express account:  $2,500 in April 2005; $2,500 in June 2005; $2,500 in October 2005; and $1,200 in July 2007.  Michael characterized these payments as "helping him [Crawford] out."

40.     Also in April 2005, from the sale proceeds, Michael paid $25,000 to the law firm that was representing Crawford and Mrs. Crawford in the 2002 Action, for their legal fees in connection with that litigation.  At trial, both Crawford and Michael testified that the $25,000 payment was a loan from Michael to Crawford, and that Crawford had signed a note promising to pay Michael back the $25,000.  No copy of the note or description of its terms was presented at trial.  As of the date of his bankruptcy filing in August 2009, Crawford had not repaid this loan.

41.      In or around June 2005, Michael transferred the remaining sale proceeds into his Sovereign Premier Account.  Michael continued to use the proceeds to supplement his income, to pay for health insurance and necessities.  In April 2009, the account into which he had deposited the proceeds received further deposits of at least $1,500 yet, after these deposits, had a balance as low as

$279.93.  I therefore conclude that at least as early as April 2009, Michael had completely expended and exhausted the proceeds of the sale.

**(ii)    The Ashland Property**

42.    After Crawford's 1989 transfer of his interest in the Ashland Property to Mrs. Crawford, he continued to reside in that property through the date of his bankruptcy filing in 2009.  In addition, despite the transfer, he remained personally liable after the transfer on the mortgage that then encumbered the property.  As the family's primary wage earner, his earnings paid most of each of the monthly mortgage payments that Mrs. Crawford made on this loan from 2001 through 2009.

43.    In May 2004, the Crawfords refinanced the mortgage on the Ashland Property with Wells Fargo.  As part of the refinancing process, they completed yet another URLA.  On the URLA, Crawford was listed as the borrower and Mrs. Crawford was listed as the co-borrower.  In the URLA Crawford made the following averments:

- that title was to be held in the names of Richard Crawford and Cynthia Crawford;

- that he had ownership interests in the Ashland and Cape Properties;

-  that there were no outstanding judgments against him;

- that he was not then a party to a lawsuit;

- that he was not then delinquent or in default on any loan guarantee; and

- that he had not directly or indirectly been obligated on, by guarantee, any loan that resulted in foreclosure.

Above the signature line, the URLA included the following language: "Each of the undersigned specifically represents to the Lender . . . that (1) the information provided in this application is true and correct as of the date opposite my signature."  Both Crawford and Mrs. Crawford initialed each page and signed the URLA.

44.     Each of the specified averments above was false and known by Crawford to be false when he made it.  At trial, Crawford stated that he had not filled out the URLA himself; rather it had been completed by a representative of Wells Fargo.  I find this testimony unconvincing.  Crawford and Mrs. Crawford initialed each page and signed the URLA, thereby attesting to its accuracy.  As a mortgage originator, Crawford was familiar with the URLA and understood the importance of making truthful and accurate representations.

45.     In the same URLA, and specifically in the section thereof that required the borrowers to disclose the real estate they owned, Mrs. Crawford omitted the North Carolina Properties, the mortgages that encumbered them, and the mortgage, insurance, and tax payments they required.  She thereby misrepresented the extent of her assets, liabilities, and monthly debt service.

46.     Wells Fargo subsequently approved the Crawfords for the new mortgage loan they were seeking.

47.     From 2001 through 2009, Crawford also remained a joint obligor with Mrs. Crawford on their home equity line of credit with Norwood Cooperative Bank (the "Norwood Home Equity Line"), which also was secured by the Ashland Property.  Crawford's earnings paid most of each payment the Crawfords made from 2001 through 2009 on the Norwood Home Equity Line.  Throughout this period, they continued to draw down on the Norwood Home Equity Line.  When Crawford's income decreased in 2007 and 2008, they began to draw against it to cover their expenses.  At the time Crawford filed his petition, the outstanding balance on the Norwood Home Equity Line was $99,469.14.

**(iii)     The North Carolina Properties**

48.     In keeping with their practice of paying the household expenses, Crawford transferred money each month to Mrs. Crawford to pay the mortgages, taxes, condo fees, and other expenses associated with the North Carolina Properties.  The monthly payment for the expenses on both lots was around $1,200.  In the nine years from when they purchased the properties until Crawford filed his

bankruptcy petition, the Crawfords expended approximately $122,400 on the properties over and above their down payments.

49.      Despite the Crawfords' initial aspiration to build a retirement home on the North Carolina Properties, they never were able to do so.

50.      In July 2007, Mrs. Crawford granted a second mortgage on the North Carolina Properties to the law firm that was representing the Crawfords in the 2002 Action, to secure the payment of legal fees for the 2002 Action.  At the time of Crawford's bankruptcy filing in 2009, the North Carolina Properties were fully encumbered.

**(iv)      The 2002, 2007, and Supplementary Process Actions**

51.      The 2002 Action—in which Premier sought to avoid and recover as a fraudulent conveyance Crawford's 1989 transfer of his interest in the Ashland Property to Mrs. Crawford—was tried in April 2007 without a jury in front of Superior Court Judge Maureen Hogan.  On February 29, 2009, Judge Hogan issued findings of fact and rulings of law and, on the basis of these, dismissed the action on its merits.  Her findings included the following:

    a.   that Premier had failed to prove that Crawford transferred his interest in the Ashland Property with actual intent to hinder, delay or defraud his creditors;

    b.   that Crawford had transferred his interest in the residence to his wife without fair and adequate consideration; and

    c.   that Premier had not met its burden of showing that Crawford was insolvent at the time of the transfer of his interest in the Ashland Property to his Mrs. Crawford.

52.      In or about February 2007, Premier commenced another action in Middlesex Superior Court in which it named Crawford, Michael Crawford, and Mrs. Crawford as defendants (the "2007 Action").  The substance of the complaint is not in evidence.  The suit remained pending when, in August

2009, Crawford filed his bankruptcy petition.  It has been dismissed against Crawford but remains

pending against Mrs. Crawford and Michael.

53.     In 2008, Premier commenced a supplementary process action against Crawford in

Middlesex Superior Court to enforce its judgment against Crawford.  In that action, Premier succeeded

in collecting from Crawford, by garnishment of his wages, a total of $7,030.68 from April 1, 2009

through August 7, 2009.

**d.     The Bankruptcy Case**

**(i)     Filing of Petition, Schedules, and SOFAs**

54.     On August 11, 2009, Crawford filed his petition for relief under chapter 7 of the

Bankruptcy Code.   In doing so, he was assisted and represented by attorney John Desmond.  Lynne Riley

was appointed chapter 7 trustee, and the first meeting of creditors was scheduled for September 15,

2015.

55.     Crawford did not file his schedules, Statement of Financial Affairs ("SOFA"), and other

necessary documents with his petition, and therefore the Court ordered that these be filed on or before

August 27, 2009.  On August 26, 2009, Crawford, through Attorney Desmond, moved for a 12-day

extension of the time to file these documents, and the Court promptly extended the deadline

accordingly.

56.     On September 8, 2009, Crawford signed and filed his schedules and SOFA ("Original

SOFA").  He testified that these had been completed by Attorney Desmond with information that he

(Crawford) had earlier supplied to Desmond, that Desmond had then asked Crawford to come into his

office to review the documents before they were filed, and that he (Crawford) had been rushed in

performing this review because Desmond was leaving for vacation imminently and needed to get the

documents filed before he did.  Later Crawford testified that the rush was not caused by an imminent

vacation but because Desmond needed to get the documents filed—the documents were due that day.

When asked whether he had read the schedules before he signed them, Crawford answered that he had

read them only "in part," "because we didn't have time to.  I went through them very quickly with Mr.

Desmond."  "I had about five minutes to sign these things and submit them."  Asked whether he had

reviewed the Statements and SOFA for accuracy, he said: "I don't believe I read all the documents.  I

signed them at the direction of counsel."  Crawford did not call Desmond as a witness to corroborate

any of this.  Asked to clarify whether he had signed the Schedules and SOFA without reviewing them *on

the advice of counsel*, he answered "no."  I conclude that Desmond did not direct or advise Crawford to

sign the documents without first reviewing them.  Crawford did not explain how it came to be that he

had not created or budgeted sufficient time to review the Schedules and SOFA. Nor did he indicate

whether they considered requesting a further extension in order to make an adequate review possible.

57.     Notwithstanding his claim to have been rushed, Crawford filed with his schedules a

signed declaration:  "I declare under penalty of perjury that I have read the foregoing summary and

schedules, consisting of 17 pages, and that they are true and correct to be best of my information,

knowledge and belief."  Likewise, in his Original SOFA, he signed a declaration:  "I declare under penalty

of perjury that I have read the answers contained in the foregoing statement of financial affairs and any

attachment thereto and that they are true and correct."

58.     The meeting of creditors was commenced on September 15, 2009.

59.     A week later, on September 22, 2009, Crawford moved to amend his SOFA to include, at

item 4(a), a lawsuit that had been omitted and to supplement the statements regarding payments to

creditors.  With the motion, he filed an amended SOFA (the "Amended SOFA").  The Court allowed the

motion to amend.  In the Amended SOFA as in the original, Crawford, by his signature, declared under

penalty of perjury that he had read the answers contained in it and that they were true and correct.

60.    On April 15, 2011, Crawford moved for leave to file an amended Schedule B, the schedule of personal property.  With it, he filed the amended schedule ("Amended Schedule B").  The court granted leave to amend.

**(ii)    Representations as to Real Estate**

61.    The schedule of real property, Schedule A, instructs a debtor to "list all real property in which the debtor has any legal, equitable, or future interest."  In his Schedule A, Crawford indicated simply "none," that he held no interest in real property.  Premier contends that this answer was false in three respects and that in each respect Crawford made the misrepresentation knowingly and fraudulently.

**(A)    Statutory Interest in North Carolina Properties**

62.    Premier contends that under North Carolina statutory law, Crawford held, at the time of his bankruptcy filing, an interest in the North Carolina Properties that would vest in him if and when Mrs. Crawford died and he survived her.  It is not clear that this statutory right constituted a property interest of Crawford in August 2009, but I need not determine the issue.  Crawford testified credibly that he was unaware of this statutory right when he completed the schedules, that he became aware of it only later in the fall of 2009, when Mrs. Crawford was selling the North Carolina Properties.  In the fall of 2009, the chapter 7 trustee abandoned whatever interest Crawford's bankruptcy estate held in the North Carolina Properties—a sign that the interest had no value to Crawford or the estate.  After the abandonments were complete, Mrs. Crawford did sell the North Carolina Properties in the fall of 2009.  The sales yielded no net proceeds for either of the Crawfords but, by virtue of the mortgage they had earlier given their attorneys on the North Carolina Properties, did result in payment to their attorneys.  I conclude that Crawford's omission of his statutory interests, if false, was neither knowing nor fraudulent.

**(B)      De Facto Interest in North Carolina Properties**

63.      Premier contends that, though record title to the North Carolina Properties was in Mrs. Crawford alone, Crawford had, at the time of his bankruptcy filing and throughout the year before it, a de facto ownership interest in the properties, essentially as a joint tenant with Mrs. Crawford.  The evidence supports this contention, and I find accordingly.  Notwithstanding that title was at all times in Mrs. Crawford, it is undisputed that (i) the North Carolina Properties were purchased by *both* Crawfords for their *joint* use in retirement, (ii) Crawford obligated himself on the mortgage loans by which they financed the purchase of these properties, (iii) Crawford, as the primary bread winner in the family, funded most of the payments the couple made over nine years on the mortgages, taxes, condo fees, and other expenses associated with the properties, (iv) Crawford on several occasions represented to his lenders and prospective lenders that he owned the properties either solely or jointly with Mrs. Crawford, and (v) Mrs. Crawford always regarded the North Carolina Properties as owned jointly.  On the basis of all the evidence, I further find that the couple placed record title in Mrs. Crawford alone only to keep the North Carolina Properties from the reach of Premier.  In everything but record title, Crawford and Mrs. Crawford consistently treated these properties as jointly owned.

64.      Premier further contends that Crawford's failure to disclose his ownership interests in the North Carolina Properties on Schedule A was a false oath made knowingly and fraudulently.  I find that the omission of Crawford's de facto interests in the North Carolina Properties was a false representation.  However, Premier has not shown by a preponderance of the evidence that Crawford understood the omission to be a false statement.  Crawford, who is not an attorney, knew that record title was in Mrs. Crawford.  Premier has not shown that his understanding of ownership, and of what Schedule A required of him, was any more nuanced than that.

65.      Premier further contends that, in the year before his bankruptcy filing, and with intent to hinder, delay, or defraud Premier, Crawford concealed his ownership interest in the North Carolina

Properties.  Crawford has not carried its burden on this allegation.  In 2007, Mrs. Crawford had given a

second mortgage on the North Carolina Properties to the law firm that was representing her and

Crawford in litigation with Premier.  Especially in view of that second mortgage, it is doubtful that

Crawford had equity in the North Carolina Properties in the year before his bankruptcy filing.  The

twelve-month period in question—commencing in August 2008—was notoriously bad for real estate

values in general.  When they sold the properties in 2009, the Crawfords received no proceeds:  all went

to pay the first and second mortgages.  In short, by the date one year before Crawford's bankruptcy

filing, Crawford likely believed himself to have nothing to hide.  Moreover, by that date, discovery in the

2007 Action was under way; by virtue of that discovery, if not of previous litigation between the parties,

it is doubtful that Premier did not already know of the North Carolina Properties and Crawford's

relationship to them.  Premier has not carried its burden as to either concealment or intent to hinder,

delay, or defraud.

### (C)     De Facto Interest in Ashland Property

66.     Premier contends that, though record title to the Ashland Property was in Mrs.

Crawford alone, Crawford had at the time of his bankruptcy filing a de facto ownership interest in the

property, essentially as a joint tenant with Mrs. Crawford.   The evidence supports this contention, and I

find accordingly.  Notwithstanding that title was at all times in Mrs. Crawford, it is undisputed that (i) the

Ashland Property was purchased by *both* Crawfords for their *joint* use as their home, (ii) at all relevant

times over several decades, Crawford did use it as his home, (iii) Crawford obligated himself on the

mortgage loan by which they financed the purchase of this  property, (iv) Crawford, as the primary

bread winner in the family, funded most of the payments the couple made over many years on the

mortgages, taxes, and other expenses associated with the property, (v) Crawford on several occasions

represented to his lenders and prospective lenders that he owned the property jointly with Mrs.

Crawford, and (vi) Mrs. Crawford always regarded the Ashland Property as owned jointly.

23

67.     Premier further contends that Crawford's failure to disclose his ownership interest in the Ashland Property on Schedule A was a false oath made knowingly and fraudulently.  I find that the omission of Crawford's de facto interests in the Ashland Property was a false representation.  However, for the same reason as I articulated above with respect to the North Carolina Properties, Premier has not shown by a preponderance of the evidence that Crawford understood the omission to be a false statement.

### (iii)    Representations as to Personal Property

68.     The schedule of personal property, Schedule B, instructs a debtor to "list all personal property of the debtor of whatever kind."  It lists some 34 distinct types of property and includes a catch-all for "other personal property of any kind not already listed."

### (A)    Books

69.     Item 4 of Schedule B requires a debtor to disclose "books, pictures and other art objects, antiques, stamp, coin, record, tape, compact disc, and other collections or collectibles."  For this item, Crawford indicated "none."  When he filed his bankruptcy petition, Crawford and his wife jointly owned some old text books (some belonging to Crawford from no later than 1990, others that had been Michael's), a family bible, children's books for their grandchildren, and some automotive magazines.  Crawford testified credibly that they had no significant value and that he believed this particular item called for "books of value as in rare books or something of substantial value" and that none of the books in his home met that description.  Premier has offered no evidence, indeed made no attempt, to establish that the books in question had any value whatsoever or that anyone might reasonably think them worthy of bringing to the attention of the trustee, either for their own value or for another purpose. Assuming for the sake of argument that Schedule B required that these books be disclosed, Premier has not carried its burden of proving that Crawford omitted them "fraudulently" within the meaning of 11 U.S.C. § 727(a)(4).

**(B)      Deferred Compensation and Cash Balance Plans**

70.      Item 12 of Schedule B requires disclosure of "[i]nterests in IRA, ERISA, Keough or other pension or profit sharing plans.  Give particulars."  In his original Schedule B, Crawford disclosed two plans:  a Wells Fargo 401(k) plan, which he valued at $148,000.00, and an "IRA with UBS," which he valued at $16,727.11.  At the time, Crawford had two other plans that should have been disclosed at item 12:  a deferred compensation plan (the "Deferred Compensation Plan") and a Wells Fargo cash balance plan (the "Cash Balance Plan").  By virtue of its omission of each, Crawford's response to item 12 was a false statement.

71.      In his Amended Schedule B, which he filed in 2011, Crawford reiterated the same disclosure he had made as to the 401(k) plan and the IRA.  This time, however, he also disclosed the Deferred Compensation Plan, with an indication that its value was $69,216.99 as of December, 2010.  He also noted:  "Anti alienation provision—excluded from estate."  And he further indicated that the current value of his interest in the property without deducting any secured claim or exemption was $0.  By virtue of its omission of the Cash Balance Plan, Crawford's response to item 12 in his Amended Schedule B was a false statement.  Premier now alleges, and Crawford denies, that Crawford's omissions of the Cash Balance and Deferred Compensation Plans were material and committed knowingly and fraudulently.

72.      With respect to the Cash Balance Plan, Crawford contends that the omission was an innocent error on his part.  Each calendar quarter, he would receive from his employer, Wells Fargo, a single quarterly report as to two retirement plans: the Cash Balance Plan and the 401(k) Plan.  When Crawford compiled the information for completing his schedules, he simply gave his then most recent statement, for the quarter ended June 30, 2009, to Desmond.  Crawford did not indicate whether he gave Desmond any information about the Deferred Compensation Plan.  On June 30, 2009, the Cash Balance Plan had a balance of $33,434.33, and the 401(k) Plan had a value of $115,060.67.  The 6/30/09

quarterly statement reported these separately, but it also reported them together as "Total Retirement

Accounts" with an aggregate value of $148,495.00.  Desmond then completed Schedule B in the manner

in which it was filed:  he listed the 401(k) plan, gave as its value the approximate combined value of the

401(k) Plan and the Cash Balance Plan, omitted any separate mention of the Cash Balance Plan, and also

omitted the Deferred Compensation Plan.

73.     Crawford reviewed the Schedules, including Schedule B, before he signed them and

authorized Desmond to file them, but the review was rushed, Crawford testified, because the review

was left until the last hours before the Schedules were due.  Consequently, Crawford testified, he was

unable to review the completed schedules in detail.  Crawford concedes that, in performing his review

of Schedule B, he read Schedule B and item 12 in particular, and he saw the 401(k) Plan and the figure of

$148,000; nonetheless, he testified, he did not notice that the Cash Balance and Deferred Compensation

Plans were not listed.

74.     Crawford's testimony about these omissions and their genesis is vague, thin on detail,

not wholly consistent with itself, and uncorroborated.  He testified the Cash Balance Plan was not listed

"for whatever reason."  He offered little testimony about what he told Desmond about his retirement

plans in general and the Cash Balance and Deferred Compensation Plans in particular.  When asked by

Premier's counsel why he had not listed the $33,000 Cash Balance Plan, he answered, "I don't have a

good answer for you, sir."  He initially testified that in performing his review of item 12 in Schedule B, he

and Desmond had a discussion.  "Q. Did you look at the number [the $148,000 value for the 401(k)

plan]?   A. Yeah. And I -- we had a discussion.  Desmond must have pulled it up from the sheet, sir.  I

don't—I don't have any other way to answer you."  Later, however, Crawford equivocated, saying he

wasn't sure whether he'd had that discussion with Desmond or, years later, with new counsel.  "But I

definitely conferred with one of you but I'm not sure which one."  Crawford did not specify the

substance of this alleged discussion.  Especially in view of Crawford's own confusion and inability to

26

explain the omissions, it is notable that he did not call Desmond to corroborate his story and supply

missing details.  Nor did he offer any explanation for not calling Desmond as a witness.  He did not

testify that Desmond counseled him to cut corners in order to accommodate Desmond's own schedule

or for any other reason.

75.    Crawford now seeks a finding that the Cash Balance Plan was part of the 401(k) Plan and

did not need to be separately listed.  Crawford so testified at trial, but Wells Fargo's quarterly reports of

the Cash Balance and 401(k) Plans lists them as two separate plans.  It is entitled "401(k) Plan and Cash

Balance Plan," reports them as separate accounts, and reports their combined value as "Total

Retirement Accounts."  Crawford acknowledged that the two plans appeared under separate headings.

Other than his self-serving testimony, Crawford has offered no reason or evidence to conclude that the

Cash Balance Plan is or was part of the 401(k) Plan, or that, when he filed his Schedules, he understood

the Cash Balance Plan to be part of the 401(k) Plan.  I find that they are separate plans and that, when

he filed his Schedules, Crawford did not believe otherwise.

76.    With respect to the Deferred Compensation Plan, too, Crawford contends that the

omission was an innocent error.  This plan contained some $60,000 in benefits at the time of the

bankruptcy filing, benefits that had accrued from participation from 2004 through 2007.

77.    Crawford contends that, by virtue of certain of its terms, the Deferred Compensation

Plan is excluded from his bankruptcy estate.  See 11 U.S.C. § 541(c)(2).  But Schedule B required him to

list "all personal property *of the debtor* of whatever kind," not only such property of the debtor as would

become property of the estate.  He concedes that the Deferred Compensation Plan was his property;

and he did not testify that, when he filed his Schedules, he believed he was not obligated to disclose this

Plan on Schedule B.  Nor did he testify that, when he filed his Schedules, he believed this plan would be

excluded from the bankruptcy estate—much less that he believed the trustee would be of the same

mind on that issue.  He understood that he was obligated to disclose the Deferred Compensation Plan.

78.     When asked at trial why he hadn't listed the Deferred Compensation Plan, Crawford

answered:  "The same reason as the other [the Cash Balance Plan]. I presented those to counsel and he

didn't list them."  Again, however, Crawford is vague on the details.  What had he presented to counsel?

He did not say.  He contends that, in his rushed review of the Schedules, he did not notice the omission

of this plan and its $60,000 value.

79.     In view of his admitted omission of two plans, the confusion in Crawford's excuses and

testimony, his admission that he did review this item, the lack of corroboration from that attorney on

whom he blames the omissions, and Crawford's general lack of credibility, I do not find credible his

explanation for the omissions and accordingly find that they were made knowingly and fraudulently.  I

further find that, if the omissions were not knowing and fraudulent, they were at least made with

reckless disregard for the truth.

**(iv)     Omissions of Creditors**

80.     The schedule of creditors holding unsecured nonpriority claims, Schedule F, instructs a

debtor to list (i) the name of each entity holding an unsecured nonpriority claim against the debtor as of

the date of the filing of the petition and (ii) the amount of the claim.

81.     On the date of the bankruptcy filing, Crawford remained indebted to Michael Crawford

for $25,000 that Michael had advanced on Crawford's behalf for attorney's fees.  Crawford failed to list

this debt on Schedule F.

82.     Just before he filed his bankruptcy petition, Crawford borrowed from a friend, one Kevin

Keating, the funds needed to pay his bankruptcy attorney's fees, credit counseling fee, and bankruptcy

filing fee, a total of approximately $3,400.  This loan remained outstanding on the petition date.

Crawford testified that he paid off the loan on his next pay day after the bankruptcy filing.  Crawford

failed to list this debt, too, on Schedule F.  However, he did disclose in item 9 of the SOFA, for "payments

related to debt counseling or bankruptcy," that the $3,033 that he had paid Desmond to represent him

in the bankruptcy case, plus the $299 filing fee and the $68 credit counseling fee, had been "advanced by a friend."  I find that the omission of this debt from Schedule F was not made with fraudulent intent.

**(v)      Omission of 2007 Lawsuit**

83.      At item 4(a), the SOFA requires a debtor to "[l]ist all suits and administrative proceedings to which the debtor is or was a party within one year immediately preceding the filing of this bankruptcy case."  In the Original SOFA, Crawford listed the 2002 Action and the Supplementary Process Action but failed to list the 2007 Action.  By virtue of this omission, Crawford's answer to this item was false.

84.      Crawford asserted a counterclaim against Premier in the 2007 Action, and he did list that counterclaim under accounts receivable in his original Schedule B.  Crawford also disclosed the 2007 Action itself in the Amended SOFA that he filed on September 22, 2009.

85.      Crawford conceded that when he filed his bankruptcy schedules, he was a party to the 2007 Action and that he had filed his bankruptcy petition in part for relief from that action.  He had knowledge of the omitted action.  Crawford testified that he believed the omission "was an oversight by the attorney," meaning Desmond.  Crawford did not indicate what he had told Desmond about this action.  Nor did Crawford indicate whether, before he signed and filed the SOFA, he had reviewed the response to this item and was aware of the omission.  I find that Crawford did not make this particular misrepresentation with intent to deceive, but I also find that he made it with reckless disregard for the truth by signing and filing the SOFA without having first reviewed his attorney's draft of the SOFA.

**(vi)      Omission of Transfers of Cash to Mrs. Crawford**

86.      Premier would have the Court find that Crawford made a false oath by omitting from the Original SOFA certain transfers of cash that he made to Mrs. Crawford within one year before the commencement of his bankruptcy case.  Premier does not specify where in the SOFA such transfers should have been disclosed.

87.   SOFA item 3(a) requires a debtor to list certain payments on debts to creditors made

within the ninety days before the commencement of the case.  SOFA item 3(c) requires a debtor to list

all payments to creditors who are or were "insiders" made within the year before the commencement

of the case.  Mrs. Crawford, as Crawford's spouse, is an insider.  See 11 U.S.C. § 101(31)(A)(i) (in the

Bankruptcy Code, "insider" includes, if the debtor is an individual, a relative of the debtor).  However,

she was not a creditor at the time of Crawford's bankruptcy filing or at any time in the year before it;

Premier does not contend otherwise.  Therefore, Crawford was not obligated to list transfers to her in

item 3(a) or 3(c), and his omission of certain transfers *to her* from those items did not render his

answers false.

88.   Crawford nonetheless did list some transfers to her in item 3(a), but only because the

transfers in question were, by design and the couple's long-standing practice, used by Mrs. Crawford to

pay Crawford's creditors.  Mrs. Crawford was not herself the creditor but an intermediary through

whom Crawford effected payment of creditors.[3]

89.   SOFA item 10(a) required Crawford to list "all other property, other than property

transferred in the ordinary course of the business or financial affairs of the debtor, transferred either

absolutely or as security within two years immediately preceding the commencement of this case."  In

both his Original SOFA and his Amended SOFA, Crawford answered "none."  The payments that Premier

contends that Crawford failed to disclose were, in each instance, transfers that Crawford made to Mrs.

Crawford to enable her to pay their household expenses.  This was their long-standing practice.  I find

that the transfers in question were made in the ordinary course of the financial affairs of the Crawfords.

The omission of these transfers from item 10(a) did not render his answer false.

---

[3] Premier does not complain that Crawford omitted mention of payments to creditors that he made through Mrs.
Crawford.  It complains only of omission of payments to Mrs. Crawford.

**(vii)      Omission of De Facto Interests in Automobiles**

90.      On the date of the bankruptcy filing and throughout the year before the filing, the

Crawfords owned between them four antique automobiles: (1) a 1978 Ferrari; (2) a 1953 MG; (3) a 1993

Porsche 911; and, albeit less antique, (4) a 2001 Porsche Boxster.  Record title to the Ferrari was held

jointly by Crawford and Mrs. Crawford; title to the MG and two Porches (the "Other Three Vehicles")

was held in Mrs. Crawford's name alone.  On his Original Schedule B, Crawford disclosed his interest in

the Ferrari but disclosed no interest in the Other Three Vehicles.  Notwithstanding his failure to disclose

any interest of his own in the Other Three Vehicles, Crawford did disclose them on his Schedule D, the

schedule of creditors holding secured claims.  Specifically, he noted there that, with respect to a secured

debt to Norwood Bank, "the creditor also has security interest in 2001 Porsche Boxster, 1993 Porsche

911 and a 1953 MG Model TD that are owned by debtor's wife."

91.      Premier contends that, though record title to the Other Three Vehicles was in Mrs.

Crawford alone, Crawford was, at the time of his bankruptcy filing and throughout the year before it,

their de facto owner, either in part or in whole, and that his failure to disclose his ownership interests in

them on his Original Schedule B was a false oath.

92.      Although no evidence was presented at trial as to when the antique cars were

purchased or whose name they were originally titled in, Crawford testified that, over the years, his

income paid for them.

93.      Crawford testified at trial that the Other Three Vehicles were titled in Mrs. Crawford's

name because, in view of his driving record, it cost less to insure the vehicles in her name than in his.

From all of the evidence in this case, it is also clear that the Crawfords held the Other Three Vehicles in

Mrs. Crawford's name to keep them from the reach of Premier, who was a creditor of Crawford alone.

94.      The four vehicles were purchased for Crawford's pleasure and benefit.  He admitted to

being a car nut.  In their marriage, he, not Mrs. Crawford, is the collector of antique automobiles.

95.      In a personal financial statement that Crawford alone gave to Norwood Cooperative

Bank in May, 2000, he indicated that he owned antique automobiles, and he valued then at $100,000.  It

is not clear whether the automobiles referenced in that statement are the same as those he owned at

the time of his bankruptcy filing; the 2001 Porsche, at least, was not likely among them.  It is clear from

the statement that Crawford held himself out as their owner.

96.      On or about July 2005, the Crawfords entered into a variable rate line of credit note and

agreement with Norwood Cooperative Bank in the amount of $75,000 (the "Norwood Line of Credit").

The note was secured by four antique vehicles.  Payment on the Norwood Line of Credit was included in

the monthly household expenses, and Crawford would transfer money to Mrs. Crawford to pay this

expense.  When Crawford's income decreased in 2007 and 2008, he drew against the Norwood Line of

Credit to supplement his income and pay expenses.  At the time of his bankruptcy filing, the balance on

the Norwood Line of Credit was $74,993.23.

97.      With his Schedules and Original SOFA, Crawford filed his Chapter 7 Individual Debtor's

Statement of Intention.  This form is used by individual chapter 7 debtors to indicate their intent with

regard to those of their debts that are secured by property of the estate.  As to the 1978 Ferrari,

Crawford indicated that he would retain the vehicle and pay the debt it secures, the Norwood Line of

Credit, according to the contract; he did not indicate that he would reaffirm the debt.  In view of his

stated intent, I find that Crawford believed he had equity in the Ferrari and the Three Other Vehicles on

the petition date, equity worth salvaging.

98.      In view of the above findings—that the antique vehicles were purchased for Crawford,

that he paid for them, that he held himself out as their owner, that he borrowed against their value, and

that he titled them in Mrs. Crawford's name only to save on insurance and keep them from Premier—I

find that, as between Crawford and Mrs. Crawford, and notwithstanding the state of record title, the

antique automobiles were his and jointly regarded as such. This was true at the time of Crawford's

32

bankruptcy filing and throughout the year before the filing.  I further find that, throughout the year

before his bankruptcy filing, Crawford kept the Other Three Vehicles titled in Mrs. Crawford's name in

order to conceal his interest in them from his creditors and especially Premier, to hinder and delay

Premier.

99.     By virtue of Crawford's omission of the three antique vehicles from his Original Schedule

B, the schedule was false, as was the Amended Schedule B for the same omission. Nonetheless, Premier

has not established that Crawford understood his omission of the Other Three Vehicles to constitute a

falsehood.  His testimony, credible on this point, is that he believed the schedule required that he

disclose only those vehicles titled in his name—that, for this purpose, record title determined ownership.

Accordingly, I find that the falsity in Crawford's answer was not made knowingly.


## III.     Jurisdiction

The matter before the court is a complaint under 11 U.S.C. § 727(a) to deny the debtor a

discharge.   The matter arises under the Bankruptcy Code and in a bankruptcy case and therefore falls

within the jurisdiction given the district court in 28 U.S.C. § 1334(b) and, by standing order of reference,

referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a).  It is a core proceeding within the

meaning of 28 U.S.C. § 157(b)(1) and (b)(2)(J) (a proceeding objecting to discharge is a core proceeding).

Accordingly, the bankruptcy court has authority to enter a final order.


## IV.     Discussion

"The statutory right to a discharge should ordinarily be construed liberally in favor of the debtor,"

and the reasons for denying of discharge "must be real and substantial, not merely technical and

conjectural."  *Boroff v. Tully (In re Tully)*, 818 F. 2d 106, 110 (1st Cir. 1987).  This is in keeping with the

primary purpose of the Bankruptcy Code, to provide the debtor with a "fresh start."  The privilege of a

discharge, however, is reserved for the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279,

286 (1991).  The burden of proof is on the party objecting to discharge.  *Tully*, 818 F. 2d at 110 ("The

burden of proof rests with the trustee.").  The standard of proof is a preponderance of the evidence.

*Grogan v. Garner*, 498 U.S. 279, 287 (1991).

Before addressing the various counts, I address the preclusive effect in this proceeding of the

Middlesex Superior Court Judgment in the 2002 Action (the "State Court Judgment").  Crawford argues

that the State Court Judgment is entitled to preclusive effect in the present proceeding on a single issue

of fact:  whether Crawford's 1989 transfer of his interest in the Ashland Property to Mrs. Crawford was

made with intent to hinder, delay, or defraud his creditors.  Judge Hogan found that that Premier had

failed to prove that Crawford transferred his interest in the Ashland Property with actual intent to

hinder, delay or defraud his creditors.  I agree, and Premier does not dispute, that that finding is entitled

to preclusive effect here.  Crawford would have this Court further conclude, and I do so conclude, that

as a result, the 1989 transfer cannot be treated as part of any pattern on Crawford's part to hinder,

delay, and defraud creditors.[4]

I hasten to add, however, that nothing about the State Court Judgment precludes the Court

from finding, as I do, that in subsequent years, Crawford did engage in an extensive pattern of conduct

that was intended and designed to hinder, delay, and defraud Premier.  I base this finding entirely on

conduct that occurred after the 1989 transfer.  It is supported in part by Crawford's subsequent conduct

with respect to the Ashland Property:  that notwithstanding the 1989 transfer of title to Mrs. Crawford,

he continued to fund the mortgage and tax payments on the property and to live in and treat the home

as his own.  But the finding of a pattern evidencing intent to hinder, delay, and defraud Premier does

---

[4] The preclusive effect of the State Court Judgment goes only to these factual issues.  The State Court Judgment
has no preclusive effect on any issue of law presented in the present proceeding, and Crawford does not contend
otherwise.  The state court judgment adjudicated only the issue of whether the 1989 transfer of the home to Mrs.
Crawford was a fraudulent conveyance under Massachusetts law.  Premier does not in the present proceeding
seek relief under 11 U.S.C. § 727(a)(2)(A) on the basis of the 1989 transfer of the Ashland Property or even on the
basis of a continuing concealment in the year preceding the bankruptcy filing of an interest in the Ashland Property.

not rest on Crawford's conduct as to the Ashland Property alone and would survive even if the Ashland

Property were removed from consideration altogether.

### a. Concealment of Property under § 727(a)(2)(A)

In Count I of its complaint, Premier alleged in conclusory fashion that Crawford, with intent to

hinder, delay, or defraud a creditor or the estate, transferred, removed, or concealed, or permitted to

be transferred, removed or concealed, property of the debtor within one year before the date of filing

of the petition.  It is impossible from the complaint to determine which of the alleged facts constitute

the basis for this count; the complaint does not expressly allege an act of concealment or specify the

assets and actions that constitute the basis of this count.  In its Pretrial Brief, Premier clarified that the

basis of this count was Crawford's continuous concealment of his assets from Premier, by keeping them

out of the reach of Premier over the ten years before the bankruptcy filing; the assets in question are (i)

his income, (ii) the North Carolina Properties, (iii) the Cape Property, and (iv) "several luxury

automobiles."   In its Post-trial Brief, Premier now seeks a determination that Crawford concealed these

same four assets or groups of assets in the year before his bankruptcy filing.[5]  I find that a count under §

727(a)(2)(A) was tried as to each of these assets with Crawford's implicit consent.  Accordingly, I will

treat these counts as raised in the complaint.  See Fed. R. Civ. P 15(b)(2) ("When an issue not raised by

the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if

raised in the pleadings."), made applicable by Fed. R. Bankr. P. 7015.

Section 727(a)(2)(A) bars a debtor's discharge if, "with intent to hinder, delay, or

defraud a creditor," the debtor "has . . . concealed, or has permitted to be . . . concealed, property of the

debtor, within one year before the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A).   Where

the alleged act is concealment, the party objecting to discharge must prove that (1) the debtor

---

[5] At no point has Premier sought a determination of continuing concealment under § 727(a)(2)(A) as to the
Ashland Property.

concealed (2) his or her property (3) within one year of the bankruptcy petition's filing (4) with intent to

hinder, delay, or defraud a creditor.  *Marrama v. Citizens Bank of Mass. (In re Marrama) (Marrama II)*,

445 F.3d 518, 522 (1st Cir. 2006); *Groman v. Watman (In re Watman)*, 301 F.3d 3, 7 (1st Cir. 2002);

*Antognoni v. Basso (In re Basso),* 397 B.R. 556, 563 (B.A.P. 1st Cir. 2008).

 "Concealment" can take various forms.  These include (i) the debtor's withholding of

information about an asset in which he or she has an interest and that he or she is duty-bound to reveal

and (ii) the debtor's ostensible transfer of title to an asset coupled with his or her secret retention of the

benefits of ownership.  *R.I. Depositors Econ. Prot. Corp. v. Hayes (In re Hayes)*, 229 B.R. 253, 259 (B.A.P.

1st Cir. 1999) and cases cited.  Further, under the doctrine of "continuing concealment," § 727(a)(2)(A)

can bar a debtor's discharge even if the original transfer or concealment occurred more than a year

before the petition date "if it is established that the debtor continued to conceal that interest from

creditors during the year prior to the petition filing."  *Investors Group, Inc. v. Annunziata (In re*

*Annunziata)*, 2008 WL 410643, at *5–6 (Bankr. D. Mass. Feb. 12, 2008) (citation omitted); see also *Hayes*,

229 B.R. at 259 (continuing concealment applies "when a debtor, prior to the year before bankruptcy,

has transferred property but has secretly held something back, and has concealed that secret interest in

the months immediately preceding bankruptcy").  "This doctrine does not negate the 'act' requirement

of § 727 but merely recognizes that a failure to reveal property previously concealed can, in some

circumstances, properly be considered culpable conduct during the year before the bankruptcy

warranting a denial of discharge."  *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3rd Cir. 1993).  The Bankruptcy

Appellate Panel has cautioned:  "Section 727(a)(2)(A) plaintiffs must prove that the requisite conduct,

accompanied by the requisite intent, actually took place within the year preceding the bankruptcy."

*Hayes*, 229 B.R. at 260.

 While § 727(a)(2)(A) has a one-year limitation period, under the continuing concealment

doctrine, a transfer made more than a year prior to filing "may serve as evidence of the requisite act of

concealment where the debtor retains a secret benefit of ownership in the transferred property within the year prior to filing." *Keeney v. Smith (In re Kenney)*, 227 F.3d 679, 684 (6th Cir. 2000); *see also Rosen v. Bezner*, 966 F.2d 1527, 153 (3d Cir. 1993); *Thibodeaux v. Oliver (In re Oliver)*, 819 F.2d 550, 555 (5th Cir. 1987). The continuing concealment doctrine "seeks to prevent a debtor from representing to the world that the debtor has transferred away all his interest in property while in reality retaining some secret interest." *Rozen v. Bezner*, 966 F.2d at 1532. In cases of real property, courts have found that a debtor continuously conceals a beneficial interest in property when the debtor transfers title to a third party but continues to make all mortgage, tax, and insurance payments and continues to live and use the property like a true owner. *See e.g., Keeney v. Smith (In re Kenney)*, 227 F.3d 679, 683-684 (6th Cir. 2000)(affirming bankruptcy court's finding that debtor concealed his beneficial interest in property titled in his parents' names when debtor paid all mortgage obligations and lived rent-free); *Investors Group, Inc. v. Annunziata (In re Annunziata)*, 2008 WL 410643 *6 (Bankr. D. Mass. February 12, 2006) (holding that the debtor maintained a secret beneficial interest in property titled in wife's name when debtor reaffirmed the mortgage obligation and continued to live in the property).

The plaintiff must also prove actual intent to hinder, delay, or defraud a creditor in the one-year period. *Razzaboni v. Schifano (In re Schifano)*, 378 F.3d 60, 67 (1st Cir. 2004). Because a debtor is unlikely to admit fraudulent conduct, the debtor's intent may be inferred from circumstantial evidence or the debtor's course of course of conduct. *Marrama v. Citizens Bank of Massachusetts (In re Marrama)*, 445 F.3d 518, 522 (1st Cir. 2006)(internal citations omitted).

**(i)    Income**

There is no dispute that, from 2001 through the bankruptcy filing in 2009, Crawford transferred large amounts of his income to Mrs. Crawford and, to a much lesser extent, Michael. These transfers may be divided into three groups: those to Mrs. Crawford for the purpose of paying household

expenses; those to Mrs. Crawford in excess of amounts needed to pay household expenses, all of which occurred in 2002 and 2003; and a single transfer of $30,000 to Michael in 2004.

The transfers to Mrs. Crawford for payment of household expenses were consistently and promptly used by Mrs. Crawford to pay household expenses.  The funds transferred to Mrs. Crawford before the date one year before the bankruptcy filing were no longer in her custody or control on that date.  Some of these transfers were made in the year before the bankruptcy filing, but in no instance were these transfers made with intent to hinder, delay, or defraud creditors.  This was Crawford's way of paying his creditors, not a means of secreting excess cash to his wife to hold for his benefit.  As to these funds, Premier's count under § 727(a)(2)(A) fails for lack of the requisite intent and because, as to most of the funds in issue, the funds had been transferred to third parties before the commencement of the relevant period—they were no longer Crawford's to conceal.

The transfers of excess cash to Mrs. Crawford in 2002 and 2003, on the other hand, were made by Crawford precisely for her to hold for his benefit and shield from Premier.  However, these transfers were made long before the commencement of the one-year period before the bankruptcy filing, and the preponderance of the evidence does not permit me to find that, on the date one year before Crawford's bankruptcy filing, Mrs. Crawford continued to hold any portion of the funds in question, in accounts in her name or otherwise.  I cannot find that there remained funds to conceal in the one-year period.

The transfer of $30,000 to Michael Crawford in 2004 fails for two reasons.  First, as I have found, this transfer was a true transfer, not a concealment of Crawford's funds in Michael's name.  Second, Michael had completely expended the transferred funds before the commencement of the one-year period.  For lack of funds to conceal, there could be no concealment.

### (ii)    North Carolina Properties

With regard to the North Carolina Properties, I have found that from the date of Mrs. Crawford's acquisition of the North Carolina Properties through the date of the bankruptcy filing, Crawford had one-half interests in the properties and concealed them by placing record title in Mrs. Crawford alone. However, the evidence fails to establish that in the year before the bankruptcy filing, Crawford continued this concealment with the requisite intent to hinder, delay, or defraud a creditor.  The preponderance of the evidence suggests that, by the commencement of the one year period, the Crawfords had no equity in the North Carolina Properties—Crawford can have had no motive or intent to conceal.  In addition, by virtue of litigation between the parties, it is doubtful that Premier did not already know of the North Carolina Properties and Crawford's relationship to them.  Therefore, I cannot find that what was concealed in its inception remained concealed in the one year period.  For these reasons, Premier's count under § 727(a)(2)(A) fails as to the North Carolina Properties.

### (iii)    Proceeds of Cape Property

Michael sold the Cape Property in 2005.  Though he used some $40,000 of the proceeds for his father's purposes, I am satisfied that the proceeds, like the Cape Property, were Michael's alone, not his father's.  Michael's ownership of sales proceeds during the one year period before the bankruptcy filing was not a concealment of any interest of Crawford's in the proceeds.   Indeed, Premier has not shown by a preponderance of the evidence that any part of the sale proceeds remained even in Michael's name at the commencement of the year before the bankruptcy filing.  For both of these reasons, Premier's count under § 727(a)(2)(A) fails as to the proceeds of the Cape Property.

### (iv)    Antique Automobiles

Premier contends that, though record title to the Other Three Vehicles was in Mrs. Crawford alone, Crawford was, at the time of his bankruptcy filing and throughout the year before it, their de facto owner, and that, during the one year period, he concealed his interest in the vehicles with intent

to hinder, delay, or defraud Premier.  I have found that Premier has carried its burden under § 727(a)(2)(A) as to this count.  Crawford was at all relevant times the de facto owner of the vehicles.  In the year before the bankruptcy filing , he concealed his interest in them from Premier by keeping record title in the name of Mrs. Crawford.  He did this with intent to hinder, delay, and defraud Premier.  These findings require denial of discharge on this count under § 727(a)(2)(A).

### b.  False Oath under § 727(a)(4)(A)

In Count II of its complaint, Premier alleged in conclusory fashion that Crawford knowingly and fraudulently made a false oath or account in his Schedules and Statement of Financial Affairs.  In its Pretrial Brief, Premier specified some alleged false oaths that it expected the evidence to show.  In its Post-Trial Brief, Premier now seeks judgment on each of fourteen distinct false oaths.  Premier does not now seek judgment on, or even address, two of the false oaths that it had listed in its Pretrial Brief: failures to disclose a tax refund and a safe deposit box.  I therefore deem these waived.

### (i)  Issues Not Raised by the Pleadings

Most of the alleged false oaths as to which Premier now seeks judgment were not mentioned in Premier's complaint, and Premier never moved to amend its complaint to include them.  Each of these requires a determination of whether it was tried by agreement of the parties.

### (A)  Alleged False Statements at First Meeting of Creditors

Premier now seeks denial of discharge for three false oaths that Crawford allegedly made at the meeting of creditors held pursuant to 11 U.S.C. § 341.  Premier did not mention these statements in its complaint, in the Joint Pretrial Memorandum, or in its Pretrial Brief.  Crawford had no evident notice at any time that these statements were among those for which Premier was seeking a denial of discharge under § 727(a)(4)(A).  Much less can these alleged false oaths be said to have been tried by agreement.  The Court permitted Premier to examine Crawford at trial about statements he made at the meeting of creditors, but always over Crawford's objection, and always because Premier justified the inquiry as

necessary for a purpose other than to support unpled counts based on statements Crawford had made

at the meeting of creditors.  Nor has Premier ever moved to amend the complaint to include any such

counts.

A count for denial of discharge under § 727(a)(4)(A) sounds in fraud and therefore must be pled

with particularity.  Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity

the circumstances constituting fraud or mistake."), made applicable by Fed. R. Bankr. P. 7009; 11 U.S.C.

§ 727(a)(4)(A) (for false oaths made "knowingly and fraudulently").  In certain circumstances, the Court

may permit the complaint to be amended at trial, see Fed. R. Civ. P. 15(b)(1), but Premier has not so

moved.  Notwithstanding the lack of a motion to amend, Rule 15(b)(2) states that "[w]hen an issue not

raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all

respects as if raised in the pleadings."  Fed. R. Civ. P. 15(b)(2), made applicable by Fed. R. Bankr. P. 7015.

Here Crawford did not consent to trial of these counts, either expressly or implicitly.  If anything may be

inferred from Crawford's conduct at trial, it is opposition and non-consent to Premier's reliance on

testimony at the meeting for creditors for any purpose.  Also, on the basis of representations made by

Crawford's counsel at the trial, I find that Crawford would be prejudiced by amendment of the

complaint to include counts based on alleged misrepresentations at the meeting of creditors.  I conclude

that these unpled counts were not properly tried and, accordingly, that Premier is now foreclosed from

seeking judgment on them.

### (B)        Omission of Deferred Compensation Plan

Premier also now seeks judgment under § 727(a)(4)(A) for Crawford's omission of his Deferred

Compensation Plan from his Original Schedule B.  Premier made no mention of the Deferred

Compensation Plan in its complaint or in the Joint Pretrial Memorandum.  However, in its Pretrial Brief,

filed six days before the start of trial, Premier did identify the omission of the Deferred Compensation

Plan as a false oath that it expected the evidence to show.  Still, Premier has never moved to amend the

complaint to state a count on the basis of this false oath.  At trial Premier adduced evidence regarding

this omission, but never with any indication of the purpose for which the evidence was adduced; the

evidence would have been relevant—as pertaining to Crawford's credibility, intent, recklessness—even

without forming the basis of an independent count.  In his Proposed Findings and Conclusions, Crawford

stated:  "While Premier has been on notice of Crawford's interest in the Wells Fargo deferred

compensation plan since no later than April 2011, at no time before trial did Premier move to amend its

complaint to add a claim based on the deferred compensation plan. Crawford does not concede that the

deferred compensation plan is properly part of the scope of this adversary proceeding and does not

consent to any amendment of Premier's complaint to conform to the limited evidence presented at

trial."  Premier has not answered this statement, either in Closing Arguments or otherwise.  While I do

not regard Crawford's statement as necessarily dispositive of whether this count was tried by consent, I

find that this unpled count was in fact tried without consent, either express or implied, and I conclude

that Premier may not now seek judgment on it.

(C)     <b>Omission of Cash Balance Plan</b>

Premier also now seeks judgment under § 727(a)(4)(A) for Crawford's omission of his Cash

Balance Plan from his Original Schedule B.  Premier made no mention of the Cash Balance Plan in its

complaint, in the Joint Pretrial Memorandum, or in its Pretrial Brief, and it has never moved to amend

the complaint to state a count on the basis of this false oath.   Still, extensive evidence and argument

about to the omission of this plan were presented at trial without objection; and Crawford has

addressed this count on its merits in its Proposed Findings and Conclusions and does not now argue that

this unpled count was tried without consent.  I find that it was tried by implied consent and will treat it

as properly raised.

### (D)      Omissions of Loans

Premier also seeks judgment under § 727(a)(4)(A) on the basis of each of two omissions of loan creditors:   Crawford's omission from his schedule of unsecured creditors of his obligation to Michael Crawford on a loan of $25,000; and his omission from the same schedule of his obligation to Kevin Keating for repayment of the short-term loan to facilitate the bankruptcy filing.   Premier made no mention of these omissions in its complaint, in the Joint Pretrial Memorandum, or in its Pretrial Brief, and it has never moved to amend the complaint to state counts on the basis of these omissions.   At trial Premier adduced evidence regarding these omissions, but never with any indication of the purpose for which the evidence was adduced; the evidence would have been relevant—as pertaining to Crawford's credibility, intent, recklessness—even without forming the basis of an independent count.   Crawford did not address these omissions in his Proposed Findings and Conclusions.   I find that these unpled counts were tried without consent, either express or implied.   Premier may not now seek judgment on them.

### (E)      Omission of Books

Premier also seeks judgment under § 727(a)(4)(A) on the basis of Crawford's omission from his Schedules B (original and amended) of his interests in certain books.   Premier did not mention this omission in its complaint, in the Joint Pretrial Memorandum, or in its Pretrial Brief, and it has never moved to amend the complaint to state a count on the basis of this omission.   At trial Premier adduced evidence regarding this omission but without indication of the purpose for which the evidence was adduced; the evidence would have been relevant even without forming the basis of an independent count.   Nonetheless, Crawford did address this omission on its merits in his Proposed Findings and Conclusions and did not challenge it for lack of notice or insufficient pleading.   I therefore find that this unpled count was tried with implicit consent and will address it on its merits below.

### (F)        Omission of 2007 Action

Premier also seeks judgment under § 727(a)(4)(A) on the basis of Crawford's omission from his

SOFA, item 4(a), of the 2007 Action.  Premier made no mention of this omission in its complaint or in the

Joint Pretrial Memorandum.  In its Pretrial Brief, Premier did identify the omission of the 2007 Action as

one of the false oaths that that it expected the evidence to show, but Premier has never moved to

amend the complaint to state a count on the basis of this omission.  At trial Premier adduced evidence

regarding this omission, but with no indication of the purpose for which the evidence was adduced; the

evidence would have been relevant—as pertaining to Crawford's credibility, intent, recklessness—even

without forming the basis of an independent count.  Crawford did not address this omission in his

Proposed Findings and Conclusions.  I find that this unpled count was tried without consent, either

express or implied.  Premier may not now seek judgment on it.

### (G)        Omission of Statutory Interests in North Carolina Properties

Premier also seeks judgment under § 727(a)(4)(A) on the basis of Crawford's omission from his

schedule of real property of certain statutory interests he allegedly held in the North Carolina Properties.

Premier made no mention of this omission in its complaint, in the Joint Pretrial Memorandum, or in its

Pretrial Brief, and it has never moved to amend the complaint to state a count on the basis of this

omission.  At trial Premier adduced evidence regarding this omission, but without indicating the purpose

for which the evidence was adduced; the evidence would have been relevant—as pertaining to

Crawford's credibility, intent, and recklessness—even without forming the basis of an independent

count.  Crawford did not address this omission in his Proposed Findings and Conclusions.  I find that this

unpled count was tried without consent, either express or implied.  Premier may not now seek judgment

on it.

**(H)      Omission of Transferred Cash in Mrs. Crawford's Account**

As a further basis for denial of discharge under § 727(a)(4)(A), Premier alleges that Crawford

knowingly and fraudulently failed to disclose in his schedules $3,800 that he had transferred to his wife

on September 2, 2009, and that remained in her bank account on the date of the bankruptcy filing but

that nonetheless remained his funds.  (Premier does not specify where in the schedules it believes this

disclosure should have occurred.)   Premier did not mention this omission in its complaint, in the Joint

Pretrial Memorandum, or in its Pretrial Brief, and it has never moved to amend the complaint to state a

count on the basis of this omission.  At trial Premier adduced evidence regarding this omission but

without indication of the purpose for which the evidence was adduced; the evidence would have been

relevant even without forming the basis of an independent count.  Crawford did not address this

omission in his Proposed Findings and Conclusions.  I find that this unpled count was tried without

consent, either express or implied.  Premier may not now seek judgment on it.

**(ii)      Applicable Law**

Section 727(a)(4)(A) states that "[t]he court shall grant the debtor a discharge, unless . . . the

debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account."  11

U.S.C. § 727(a)(4)(A).  The purpose of § 727(a)(4)(A) is to "insure that complete, truthful and reliable

information is put forward at the outset of the proceedings, so that decisions can be made by the

parties in interest based on the facts rather than fiction.  Neither the trustee nor the creditors should be

required to engage in a laborious tug of war to drag the simple truth into the glare of daylight."  *Tully*,

818 F. 2d at 110.

The party objecting to the discharge must show that (i) the debtor made an oath (ii) that was

false and (iii) related to a material fact in the case (iv) knowingly and (v) fraudulently.  *IBRC v. Drumm (In*

*re Drumm)*, 524 B. R. 329, 394 (Bankr. D. Mass. 2015); *Lussier v. Sullivan (In re Sullivan)*, 455 B.R. 829,

837 (B.A.P. 1st Cir. 2011); *Commonwealth of Massachusetts v. Bartel (In re Bartel)*, 2009 WL 2461727 at

*5 (Bankr. D. Mass. 2009).   The burden of proof is on the party objecting to discharge.  *Tully*, 818 F. 2d

at 110 ("The burden of proof rests with the trustee.").  The standard of proof is a preponderance of the

evidence.  *Grogan v. Garner*, 498 U.S. 279, 287 (1991).  *Tully* indicates, however, that "once it reasonably

appears that the oath is false, the burden falls upon the [debtor] to come forward with evidence that he

has not committed the offense charged."  *Tully*, 818 F. 2d at 110.  This language does not shift the

burden of proof or nullify the need to prove knowledge of falsity and fraudulent intent.  *Robin Singh*

*Educ. Servs. v. McCarthy (In re McCarthy)*, 488 B.R. 814, 826 (1st Cir. B.A.P. 2013) ("the existence of false

or inaccurate statements is not, in and of itself, sufficient cause to deny a debtor's discharge unless it is

shown that these were knowingly and fraudulently made").  Rather, it establishes that a false oath may

itself be sufficient to establish knowledge of falsity and fraudulent intent.  *In re Mascolo*, 505 F.2d 274,

276 (1st Cir. 1974) ("the trier may infer fraudulent intent from an unexplained false statement").  More

generally, fraudulent intent may be established by circumstantial evidence or inferred from a course of

conduct.  *In re McCarthy*, 488 B.R. at 826.  Reckless disregard for the truth has consistently been treated

as the functional equivalent of fraud for purposes of § 727(a)(4)(A).  *Id*. and cases cited; *Tully,* 818 F. 2d

at 112; *Drumm*, 524 B. R. 395 and cases cited.

        As here, a debtor's schedules and statement of financial affairs, when properly filed, are

expressly verified under oath.  *Perry v. Warner (In re Warner)*, 247 B.R. 24, 26 (1st Cir. BAP 2000)

(internal citations omitted).  When a debtor omits a transaction from the statement of financial affairs

or makes a misstatement in the schedules, he or she has made a false oath for purposes of §727(a)(4)(A).

*Harrington v. Donahue (In re Donahue)*, 2011 WL 6737074 *11 (internal citations omitted).

        A material fact under § 727(a)(4)(A) is "one that has a non-trivial effect upon the estate and

creditors." *Nickless v. Fontaine (In re Fontaine)*, 467 B.R. 267, 271 (Bankr. D. Mass. 2012).  "The subject

matter of a false oath is "material," and thus sufficient to bar discharge, if it "bears a relationship to the

bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings or the

existence and disposition of property." *Tully*, 818 F. 2d at 111.

 "Reckless indifference to the truth has consistently been treated as the functional equivalent of

fraud for purposes of § 727(a)(4)(A)." *Id.* at 112.  While an ignorant or inadvertent omission will not be

construed as evidence of fraudulent intent, "reckless disregard for the truth may nonetheless be found

based upon the cumulative effect of a series of innocent mistakes.'" *In re Fontaine*, 467 B.R. at 272

(internal citations omitted).

### (iii)   The Alleged False Oaths that were Duly Tried

### (A)   Omission of Cash Balance Plan

Premier first alleges that Crawford knowingly and fraudulently omitted from his Original and

Amended Schedules B, item 12, his interest in his Cash Balance Plan.  Crawford denies that the omission

was false (he claims that the Cash Balance Plan was part of the 401(k) Plan, which he did list) and denies

knowledge of falsity and fraudulent intent (he claims that the error in completing his schedules was his

attorney's and that he merely failed to notice it before signing and filing the schedules).  I have found

that the omission was a false statement, that Crawford made it knowingly and fraudulently, and that, if

the omission was not knowing and fraudulent, Crawford made it at least with reckless disregard for the

truth.  Crawford concedes that he made the false statement under oath.  He does not deny, and I find,

that it was material.  These findings require denial of discharge on this count.

### (B)   Omission of Books

As a basis for denial of discharge under § 727(a)(4)(A), Premier alleges that Crawford knowingly

and fraudulently omitted from his Original Schedule B, at item 4, his interest in certain books.   I have

found that Premier has not carried its burden of proving that Crawford omitted these books fraudulently,

as required by § 727(a)(4)(A).  Accordingly, this count must be dismissed.

**(C)    Omission of De Facto Interests in Ashland Property, North Carolina Properties, and Automobiles**

As three distinct bases for denial of discharge under § 727(a)(4)(A), Premier alleges that

Crawford knowingly and fraudulently omitted from his schedules of real and personal property his de

facto interests in the Ashland Property, the North Carolina Properties, and the Other Three Vehicles.  As

to each omission, I have found that Premier has not shown by a preponderance of the evidence that

Crawford understood the omission to be a false statement.  For failure of proof that these false oaths

were made knowingly, these counts must be dismissed.

**(D)    Omission of Cash Transfers to Mrs. Crawford**

As a further basis for denial of discharge under § 727(a)(4)(A), Premier alleges that Crawford

knowingly and fraudulently omitted from his SOFA certain transfers that he made to Mrs. Crawford

within one  year before the filing of his bankruptcy petition.[6]  Premier is unclear about precisely where

in the SOFA it believes these transfers should have been listed, but the only possible locations are items

3 and 10.  I have found that neither item called for disclosure of the transfers in question.  Consequently,

Crawford's omission of the transfers did not amount to a false statement.  This count must be dismissed.

**c.  Failure to Keep or Preserve Recorded Information under § 727(a)(3)**

In Count III, Premier objects to Crawford's discharge under § 727(a)(3).  Specifically Premier

alleges in the complaint that Crawford failed to maintain records concerning the deposits into or

disbursements from certain savings bank accounts of Mrs. Crawford that Crawford's earnings were

deposited into.

Section 727(a)(3) states:

(a)  The court shall grant the debtor a discharge, unless—

---

[6] This count, too, was not pled in the complaint.  Finding as I do that this count fails on its merits, I need not determine whether it was tried with Crawford's consent.

> (3) the debtor has concealed, destroyed, mutilated, falsified, or
> failed to keep or preserve any recorded information, including
> books, documents, records, and papers, from which the
> debtor's financial condition or business transactions might be
> ascertained, unless such act or failure to act was justified under
> all of the circumstances of the case.

11 U.S.C. § 727(a)(3). The initial burden is on the party objecting to discharge to prove two things: (i)

that the debtor "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded

information;" and (ii) that the recorded information was information "from which the debtor's financial

condition or business transactions might be ascertained." *Lassman v. Keefe (In re Keefe)*, 380 B.R. 116,

120 (Bankr. D. Mass. 2007). The plaintiff need not establish specific intent of any kind. *Id.* If the party

objecting to discharge proves these two requirements, the burden then shifts to the debtor to prove

that "such act or failure to act was justified under all of the circumstances of the case." *Id.*; *Campana v.*

*Pilavis (In re Pilavis)*, 244 B.R. 173, 176 (B.A.P. 1st Cir. 2000) (debtor must come forward with

justification).

Subsection (a)(3) lists six possible predicate acts. Premier relies on two of these: failure to keep

recorded information and failure to preserve recorded information. The evidence shows that Mrs.

Crawford retained and has produced her banking records going back ten years. These records have

made it possible for Premier itself to reconstruct, for the period from 2001 through 2009 and in

considerable detail, the flow of Crawford's earnings into Mrs. Crawford's accounts and her

disbursements of the same earnings from those accounts. Premier has demonstrated no failure to keep

or to preserve. In its Post-Trial Brief, Premier argues that "Crawford failed to maintain records showing

how he spent the majority of the income he earned over the last decade," but Premier's complaint did

not put Crawford to his proof as to "records showing how he spent the majority of his income over the

last decade." Premier cannot after trial redefine the scope of the count, essentially move the goal posts.

The focus of this count as pled is on two things: deposits of Crawford's income into Mrs. Crawford's

accounts, and disbursements of that income from her accounts.  The Crawford's combined banking

records are quite adequate to prove both, and this count must accordingly be dismissed.

### d.   Failure to Explain Loss of Assets

In Count IV, Premier objects to Crawford's discharge under § 727(a)(5), alleging generally that

Crawford "has failed to explain satisfactorily the loss of his assets and or the deficiency of his assets to

meet his liabilities."  Premier's complaint cites no particular loss or deficiency of assets to explain.

Section 727(a)(5) states: "The court shall grant the debtor a discharge, unless . . . (5) the debtor

has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any

loss or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5).  The Bankruptcy

Appellate Panel has summarized the burdens:

> The plaintiff has the initial burden of identifying the assets in question
> by appropriate allegations in the complaint and showing that the debtor
> at one time had the assets but they are no longer available for the
> debtor's creditors. . . .  Once the creditor has introduced some evidence
> of the disappearance of substantial assets, the burden shifts to the
> Debtor to explain satisfactorily the losses or deficiencies.

*Ehle v. Brien (In re Brien)*, 208 B.R. 255 (B.A.P. 1st Cir. 1999).  The plaintiff must identify with specificity

the loss or deficiency the debtor has failed to explain.  *M&I Heat Transfer Products v. Gorchev (In re*

*Gorchev)*, 275 B.R. 154 (Bankr. D. Mass. 2002).  The plaintiff must also show that the debtor has been

called upon to explain the loss in question, in the adversary proceeding itself if not before.  Once called

upon to explain a demonstrated loss or deficiency of assets, it falls upon the debtor to provide a

satisfactory explanation.  *Aoki v. Atto Corp. (In re Aoki)*, 323 B.R. 803, 817 (B.A.P. 1st Cir. 2005) (citation

omitted).

I need not set forth the requirements of a satisfactory explanation because I find that Premier

has not satisfied its initial burden of identifying the assets in question by appropriate allegations in the

complaint.  Judgment shall accordingly enter for Crawford on this count.

**V.       Conclusion**

Premier has met its burden by a preponderance of the evidence as to one count under §

727(a)(2)(A), for concealment of the antique automobiles titled in Mrs. Crawford's name, and one count

under § 727(a)(4)(A), for omission of the Cash Balance Plan, and thus has established cause for denial of

discharge.  All remaining counts will be dismissed, but a plaintiff need prevail on only a single count, and

therefore the Court will enter a judgment of denial of discharge.


Date:  June 3, 2015                                        _____
                                                                        Frank J. Bailey
                                                                        United States Bankruptcy Judge